*284 OPINION OF THE COURT
Bernard J. Fried, J.
In this action, seeking a declaratory judgment, damages, and other relief, arising out of a series of real estate transactions, dating back to 1983 in which the plaintiff obtained a remainder interest in fee in 14 parcels of real property located in 10 states, defendants have moved for summary judgment. (Motion sequence Nos. 002 and 003 have been consolidated for disposition.)
The main issue is whether, as a result of the transactions described below, the plaintiff remainderman became a surety, affording it the special rights provided to a secondary obligor as a result of suretyship status. Also at issue is proper construction of a 1984 third-party agreement and the obligations or rights of the remainderman, in the event of refinancing or replacement of the original mortgage.
It is undisputed that in 1983, Merrill Lynch, Pierce, Fenner & Smith, as part of the creation of three related real estate tax shelter transactions, established Lynx Properties Corp., which acquired title to 14 properties, located in 10 states, from Kmart Corporation for $35,300,000. Most of the purchase price was borrowed from Kmart, which issued 14 nonrecourse notes, each secured by a mortgage, one for each property. These mortgages constituted a first lien on the properties. The properties were then leased back to Kmart, which assigned the notes and mortgages to defendant Bank One’s predecessor in interest, the National Bank of Detroit, which acted as trustee for investors in trust certificates secured by the original notes and mortgages.
Thereafter, in 1984 Lynx Properties conveyed distinct possessory and future interests in these 14 properties to different transferees, as follows:
(1) an estate for years in each property, expiring on January 2, 2011, and a fee interest in the buildings and improvements, was conveyed to Lynx Associates, L.P.[1] (partnership), which assumed all liability under the notes and mortgages;
(2) a remainder interest in fee in the land, subject to the estate for years and the mortgages, was conveyed to the plaintiff, RM 14 FK Corp., with a specific provision excluding the plaintiff *285 from any obligation to pay the mortgage debt (concurrent with this transaction, the plaintiff granted the partnership an option to lease the land for terms which would aggregate 77 years); and
(3) a master lease, covering the 14 leases with Kmart, was assigned to Malease 14 FK Corp., the predecessor to defendant Malease 14 FK LLC.
Additionally, under these 1984 Lynx transactions, the partnership expressly agreed to primary liability for the mortgage indebtedness, as follows: “[Lynx Associates — the partnership] assumes all of the obligations of [Lynx Properties] to pay the indebtedness secured by the Deed of Trust [the original notes and mortgages].” These 1984 transactions, which resulted in the partnership holding an estate for years in the land and a fee interest in the buildings and improvements, with an option to lease for 77 years after this estate for years expired, and the plaintiff holding a remainder fee interest, were memorialized in an individual three-party agreement for each property. As is relevant here, paragraph 17 of the agreements provides:
“17. Refinancing or Replacement of Mortgage. In the event that the Partnership elects to refinance or replace the Mortgage, the Remainderman agrees to execute any and all documents as may be reasonably required by Partnership in order to effectuate such financing provided that neither Remainder-man nor any of its shareholders shall be personally liable for payment of any indebtedness or for performance of any obligation and provided further that any such indebtedness shall be held by an ‘institutional lender’ (as hereinafter defined) and shall be self-liquidating over the remaining term of the Land Estate.”
The respective three-party agreements were recorded in the states where the mortgaged properties are located.
As a result of these transactions, defendant Malease became Kmart’s “landlord” by virtue of the assignment of the leases, the plaintiff obtained a remainder fee interest in the land (as of 2011) and the partnership was granted an option to lease the properties for a period of 77 years following the expiration of the estate for years, and the partnership, in accordance with paragraph 17, could refinance or replace the mortgage.
In 1999, the following events occurred which gave rise to this lawsuit: Cortland Deposit Corporation purchased the 14 origi *286 nal notes and mortgages and entered into note modification agreements with the partnership on July 1, 1999. As a result, the original notes and mortgages were assigned to Bank One Trust Company, N.A., as trustee for defendants Teachers Insurance and Annuity Association of America, Monumental Life Insurance Company, and Southern Farm Bureau Life Insurance Company. These notes were prepaid by the partnership; however, there was no modification of the publicly recorded original mortgages. Additionally, the note modification agreement added a make-whole premium (section 2 [d]), or prepayment premium, which according to the plaintiff has led “to a pre-payment expense many times larger than the original prepayment premium.” As plaintiff notes, the original mortgages “were not pre-payable until January 1, 1999 after which there was a modest and declining pre-payment premium which would have been reduced to zero in 2004.” As part of this transaction, the partnership also obtained an additional loan of $4,850,000 from Cortland pursuant to an additional loan agreement, assigned to Bank One as trustee. This additional loan was not secured by a mortgage on any of the 14 properties.
It is undisputed that the plaintiff remainderman was not given notice of this refinancing, nor was there a request that it “execute any and all documents as may be reasonably required by Partnership in order to effectuate such financing,” as provided for in paragraph 17.
Following the 1999 transaction, the indebtedness was held by an “institutional lender,” Bank One, as trustee; the interest rate was reduced from the original rate of 13.5% to 10.07%; the principal debt now aggregated $40,150,000, which included the monies due on the additional loan note; and as required by the three-party agreement, the mortgage debt was self-liquidating by January 1, 2009.
In 2001 Kmart sought bankruptcy protection. Thereafter, in 2002 the mortgage debt on one of the properties, i.e., in New Jersey, was satisfied, leaving 13 remaining mortgages. Of these 13 mortgages, it appears that Kmart has defaulted on 12 of them, and therefore there is insufficient revenue to pay the debt service. According to the complaint, plaintiff states that it first learned of the 1999 refinancing in April 2002, which led to this action. Essential to the complaint, as set forth in the “Background” section, is the claim that the “Remainderman [plaintiff], whose Remainder Estate constituted collateral security for the debts secured by the Original [1984] Mortgages, was *287 as a matter of law, cast into the position of a surety for these obligations.” (1i 15.) The complaint contains nine causes of action,[2] all of which allege that the plaintiff is a surety.
*288 In their motion for summary judgment, defendants Bank One, Teachers, Monumental Life and Southern Farm Bureau (Bank One defendants) contend: (1) that paragraph 17 evidenced the remainderman’s consent to the 1999 refinancing; (2) that plaintiff remainderman is not a surety to the partnership’s obligations to pay the mortgage debt; and (3) that Bank One’s economic interest in the refinancing precludes a claim for tortious interference. In the companion motion for summary judgment by Lynx Properties, Lynx Associates and the Malease defendants (the Lynx defendants) adopt the first two of these contentions, and further argue that equitable remedies are inappropriate, since, assuming that the claims are cognizable, there is an adequate remedy at law. In any event, the Lynx defendants argue that the lawsuit is premature since its essence is a claim that because there is a substantial likelihood of foreclosure, the 1999 refinancing make-whole premium “eliminates any realistic opportunity to receive payment upon foreclosure,” although no such foreclosure event has occurred.
Plaintiff responds that the partnership is the principal obligor under the 1984 Lynx transactions, and that it — the remainder-man — is the surety or secondary obligor, and that as surety it was materially injured by the 1999 refinancing, which was done without its knowledge or consent. In response to the Lynx defendants’ prematurity argument, plaintiff contends that the value of its remainder interests was diminished when the refinancing occurred in 1999.
Inasmuch as the threshold issue is whether the plaintiff remainderman is a surety, I turn to it first. The gist of the defendants’ argument is that because the remainderman “has no personal obligation to pay any portion of the mortgage debt,” it is not a surety. Rather, they contend that “[pjlaintiff simply acquired real property encumbered by, and subject to, a mortgage.” Continuing with this argument, and referring to the rule that when mortgaged real estate is conveyed expressly subject to a mortgage or note, and the grantee does not assume the mortgage debt, the grantee does not become personally liable to either the mortgagor (grantor) or the mortgagee in case of a default, it is contended that therefore the plaintiff did not *289 become a surety, since it has “no contractual obligation which grants it the status of a surety.” Instead, defendants argue that the plaintiffs position “is similar to that of a junior lienor.”
This issue is resolvable by application of well-settled principles of the law of suretyship and guaranty, and the law of real estate.[3]
As Restatement (Third) of Suretyship and Guaranty (1996) makes clear, “the substance of a transaction, rather than its form, should determine whether the transaction is governed by the law of suretyship and guaranty” (Introductory Note at 3; § 1 [3] [a]; see also, Chemical Bank v Meltzer, 93 NY2d 296, 303 [1999] [“The existence of suretyship status depends upon the respective roles of the parties and the nature of the underlying transaction”]). This concept is unexceptionable and was stated clearly over 100 years ago as follows:
“An obligation in suretyship will not be implied, and never arises by act of the parties except by express contract. Yet the law will sometimes place persons in the situation of a Surety or Guarantor not by imposing the liabilities of these undertakings without their assent, but by extending to persons already bound by some other contract, the privileges of these relations.” (Stearns, Suretyship, § 23, at 24 [1902].)
The Restatement explains that “[i]n the bulk of cases, the existence of [the suretyship] relationship will be easy to discern,” recognizing that there are “many cases” in which there is a suretyship “relationship among the parties . . . yet that may not be obvious from the contracts and the labels given to them” (§ 1, Comment b). Echoing this, one commentator has observed: “Whether one is a surety . . . depends not upon that person’s relation to the obligee (the creditor) but upon his or her relation to the principal obligor (the debtor).” (23 Lord, Williston on Contracts § 61:1 [4th ed].)
As noted in Meltzer (supra at 302), “A suretyship [relationship] is, at its core, the confluence of three distinct, yet interrelated, obligations. These obligations are embodied in the tripartite relationship of principal obligor and obligee; obligee and secondary obligor; and secondary obligor and principal obligor.” This requires analysis of the rights and obligations of *290 the respective parties. The Restatement states the criteria for the analysis: regardless of the form of the transaction,
“a secondary obligor has suretyship status whenever:
“(a) pursuant to contract (‘the secondary obligation’), an obligee has recourse against a person (the ‘secondary obligor’) or that person’s property with respect to the obligation (‘the underlying obligation’) of another person (‘the principal obligor’) to that obligee; and
“(b) to the extent that the underlying obligation or the secondary obligation is performed the obligee is not entitled to performance of the other obligation; and
“(c) as between the principal obligor and the secondary obligor, it is the principal obligor who ought to perform the underlying obligation or bear the cost of performance.” (Restatement [Third] of Suretyship and Guaranty § 1.)
Thus, as the Court of Appeals observed: “When a secondary obligor is bound to pay for the debt or answer for the default of the principal obligor to the obligee, the secondary obligor is said to have suretyship status” (Meltzer at 302).
Notably, the Restatement provides that it is not only the person who may be a surety, but the person’s “property” as well. This, of course, recognizes that in some instances, real estate may, itself, be “in the situation of a surety” (Stearns, op. cit., at 25).
Normally, where there is a conveyance subject to a mortgage, with assumption of the debt, the land becomes the primary fund, and not a surety for payment of the mortgage debt (e.g., Murray v Marshall, 94 NY 611, 614 [1884]). And in such instance, the transferee also does not become a surety with respect to the mortgage debt (e.g., Elliott v Sackett, 108 US 132, 140 [1883]), rather “the debt is to be satisfied out of the land” (5 Tiffany, Real Property § 1435). When the grantee takes subject to the mortgage, then, the seller remains liable for the repayment of the debt and the land “is a fund for repayment of the debt” (9-95 Warren’s Weed, New York Real Property, Mortgages § 95.94 [1]). This refers to the usual case where the grantor has deducted the indebtedness from the purchase price. Although the grantee assumes no personal responsibility, the grantor
*291 “ha[s] the right to expect the buyer’s land to discharge the debt and exonerate the seller. While it may seem strange to view land as a debtor, that is how equity traditionally views it when a buyer takes land subject to a mortgage and receives a credit toward the purchase price” (12 Thompson on Real Property § 101.05 [a] [5] [Thomas ed]; Smith v Truslow, 84 NY 660, 662 [1881] [“The whole (mortgage debt) was to be paid and was paid in land”]; see also, Restatement [Third] of Property [Mortgages] § 5.2).
Therefore, where the grantee takes subject to, and does not assume, the debt secured by the real estate, the seller-mortgagor, “who is still obligated to the creditor becomes a secondary obligor and the buyer becomes a principal obligor whose obligation is limited to the property.” (Restatement [Third] of Suretyship and Guaranty, § 2, Comment /.)
If the transactions at issue here fit this mold, i.e., the transfer of the mortgaged land was to a grantee who took “subject to,” and the purchase price was reduced by deducting the amount of the mortgage, then the grantee would not be secondarily liable for the payment of the debt. It would be the other way around: rather, the grantor would be secondarily liable and entitled to be treated as a surety, the land being the primary fund for payment of the mortgage debt (see, e.g., Cohn v Spitzer, 145 App Div 104, 107 [4th Dept 1911], affd 207 NY 738 [1913]). “Or, as it is frequently put, the land is the principal and the transferor is only in the position of a surety or one secondarily liable.” (4 American Law of Property § 16.127 [Casner ed 1952].) It is this principle which defendant contends is controlling in this case.
This latter principle however does not end the analysis, since distinct interests in the land were conveyed by simultaneous conveyance to different persons. One of the transferees, defendant Lynx Associates (the partnership), assumed “all of the obligations” of the original mortgagor (defendant Lynx Properties) of paying the mortgages. There was no such obligation assumed by plaintiff remainderman, rather the conveyance expressly provided that the remainder fee interest was “subject to” the mortgage debt. By the express assumption of the mortgage debt, the partnership became the principal obligor. Quintessentially, this is the effect of an agreement to pay or assume the mortgage or mortgage debt. Ordinarily such agreement is viewed as creating a suretyship relationship between the original mortgagor and assuming transferee (Restatement *292 [Third] of Suretyship and Guaranty, § 2, Comment f). The question, however, is whether here, in addition to the relation created between the original mortgagor and transferee partnership, what relationship, if any, did these multiple transfers create between the remainderman and the partnership.
The effect of simultaneous transfers of distinct portions or interests of a mortgaged property has been cogent, and persuasively, explained by one authority:
“In case one or more of such [multiple] transferees assume the obligation of paying the mortgage, or take ‘subject to’ the mortgage, and the others do not do so, the part or parts conveyed to the former would be primarily liable, and those conveyed to the latter but secondarily so, as between the transferees themselves. Since the parts of the land in the latter’s hands would be only secondarily liable as against the transferor’s personal liability, while the parts in the former’s hands would be primarily liable as against the transferor’s personal liability, the parts which are thus secondarily liable as against the transferor’s personal liability would necessarily be secondarily liable as against the other parts, which are primarily liable as against that personal liability.” (Tiffany, op. cit., § 1446.)
Although research has failed to disclose a case either applying or rejecting this analysis, it seems to me that the logic of this argument is irrefutable.
Structurally, the transaction here is composed of the following constituent parts: (1) the original relationship between the mortgagee and the mortgagor; (2) the separate relationships between the transferor-mortgagor (Lynx Properties) and each of the several transferees (the partnership, the plaintiff, and Malease 14 FK LLC); and (3) the separate relationships among the transferees. As explained by Tiffany, when one of two or more transferees takes its interest, either under an assumption of the mortgage indebtedness or subject to it, and the other transferee does not, this other transferee is secondarily liable as against the transferee who is liable for the debt. The theory being that the transferee who is liable is the principal obligor, and the other transferee stands in the position of a surety. This suretyship arrangement, as described above, also would apply to the situation where one transferee assumes the debt, and the other transferee takes subject to, since the primary obligation for performance rests with the former transferee, not the latter.
*293 Therefore, viewing the substance of this entire transaction, as I am required to do, and also examining its constituent parts, it is evident that as between the partnership and the remainder-man, the parties created a suretyship relationship: the partnership, which obtained a fee interest and an estate for years, expressly assumed all liability for the mortgage indebtedness, and was primarily liable, and the remainderman’s fee interest, which was “subject to” the mortgage debt, became secondarily liable as against the primary liability of the partnership.
It is not significant, as discussed above, that there was no express contract to this effect, since the parties are otherwise bound by contracts which established this suretyship relationship. Also, it is of no significance that the remainderman “has no personal liability to pay the mortgage debt” as argued by the defendants. The land, or in this case, the remainder future interest, is entitled to be recognized as a surety, at least as to the extent of its value. The conveyances here simultaneously carved the land into various interests, thereby creating an arrangement by which one part — the remainder interest — was made secondarily liable to the other part. Thus, as between the partnership and the remainder, the rights of the parties are defined and are to be determined in accordance with the principles of the law of suretyship. Accordingly, I conclude that the remainderman is a surety. As such, the remainderman is entitled to insist that the rights of a surety be observed as to it.
The defendants also argue that the plaintiffs agreement “to execute any and all documents as may be reasonably required by the Partnership in order to effectuate” any refinancing or replacement of the indebtedness constituted consent to the 1999 refinancing, which met the conditions set forth in paragraph 17 of the three-party agreements. Thus, the argument is that there was no obligation to have provided documents to the plaintiff, if not required by the refinancing. Moreover, the defendants argue that other than the submission of documents which the partnership may have “reasonably required” and which the plaintiff would have been required to execute, there was no requirement that the plaintiff “consent to the refinancing or replacement of the indebtedness.” Moreover, according to the defendants, even “assuming” plaintiff is a surety, it had no basis to “challenge” the refinancing, and therefore there could have been no violation of its suretyship rights.
In response, plaintiff contends that it did not consent to the refinancing simply because it was obligated to execute docu *294 ments “reasonably required” in the event of a refinancing. The gist of this argument is that the plaintiff did not “automatically agree to subordinate its interests to a new financing, no matter how favorable to plaintiff” so long as the conditions of paragraph 17 were met, i.e., the plaintiff would not be personally liable; the indebtedness would be held by an institutional investor; and the debt would be self-liquidating. In other words, this requirement to execute documents “as may reasonably be required” cannot be construed “to favor only the principal obligee and the principal obligor.” To construe it this way, in effect would convert paragraph 17 into “an agreement to subordinate automatically.”
While there is no disagreement that a surety can subordinate automatically without the necessity of executing further documents, the dispute is whether this, in fact, is what the parties intended. I do not believe that this provision, as urged by the defendants, can be read unambiguously to mean that the surety consented to execute documents regardless of how unfavorable they would be to its interest. This, therefore, is a genuine issue of material fact. There is also a genuine issue of material fact as to whether the 1999 refinancing was an impairment of the plaintiffs suretyship status.[4]
The Bank One defendants also seek dismissal of the seventh cause of action (tortious interference), a claim which has four elements: “(1) the existence of a valid contract between plaintiff and a third party; (2) the defendant’s knowledge of that contract; (3) the defendant’s intentional procuring of the breach, and (4) damages” (Foster v Churchill, 87 NY2d 744, 749-750 [1996]). The defendants correctly note that economic justification is a defense to this cause of action: “As a general matter, economic interest precludes a claim for tortious interference with a contract unless there is a showing of malice or illegality.” (Collins v E-Magine, 291 AD2d 350, 351 [1st Dept 2002].) The complaint alleges that Bank One received $1,191,375 as a premium from the proceeds of the additional loan, and the plaintiff has submitted no evidence to demonstrate that Bank *295 One was acting out of malicious or illegal means. Therefore, since the undisputed facts, as alleged in the complaint, show that Bank One was acting in its economic interest, and not maliciously or illegally, the seventh cause of action must be dismissed.
Finally, the Lynx defendants claim that there is an adequate remedy at law.[5] Since I have concluded that the plaintiff is a surety, clearly if the acts of the defendants caused the impairment of plaintiff’s suretyship status, an appropriate remedy would include the discharge of the surety “to the extent that such acts would otherwise cause the secondary obligor to suffer a loss; in some cases, the discharge is total” (Restatement [Third] of Suretyship and Guaranty, supra, Introductory Note to § 37 et seq.; see also Antisdel v Williamson, 165 NY 372, 375-376 [1901]). This also disposes of the claim that this action is premature. Further discussion is unwarranted.
Accordingly, it is ordered that the Bank One defendants’ motion for summary judgment (sequence No. 002) is denied, except that the seventh cause of action (“tortious interference”) is dismissed; and it is further ordered that the Lynx defendants’ cross motion for summary judgment (sequence No. 003) is denied.

. By letter dated July 1, 2004, counsel for defendant Lynx Associates advised that it had filed for bankruptcy. Thus, as a result of the automatic stay, this action is stayed as to Lynx Associates.

. In the first cause of action, plaintiff remainderman seeks a declaration that the remainder estates be “discharged as a matter of law from the lien of the [original] Mortgages” and that the estates “are not encumbered by the mortgages held by Bank One,” because the “Remainderman, as a surety, did not agree to be bound by modifications or substitutions of the Original Mortgages without notice to it and without executing documents ‘reasonably required.’ ” The gravamen of this claim is that the 1999 financing exposed the remainderman to new obligations and risks “fundamentally different from those” in the original transaction and the remainderman, “as surety, did not agree to be bound by modifications or substitutions of the Original Mortgages without notice to it and without executing documents ‘reasonably required.’ ” (H 25.)
The second cause of action alleges that the 1999 acceptance by Bank One of prepayment of the amount owed under the original notes essentially discharged the original mortgages, and that because plaintiff remainderman did not consent to the additional loan, it created a new debt to which the remainder estates are not subject. Realleging paragraph 15, it is claimed that the remainderman, as a surety, did not agree to this refinancing and will be harmed by it. Therefore, a declaratory judgment is sought that these estates are “not encumbered by the Mortgages held by Bank One.”
The third cause of action alleges that, as a result of the 1999 financing, “in contravention of the rights of the Remainderman under the Three Party Agreements and as surety,” there has been a substantial reduction in the value of the remainder estates. An unspecified amount of damages is sought from all defendants in this claim.
The fourth cause of action has been brought against defendants Bank One, Teachers, Monumental, and Southern Farm. Again, realleging paragraph 15, as a surety, plaintiff seeks an injunction preventing these four defendants from foreclosing on “the Remainder Estates in any of the remaining 13” properties, contending that otherwise there will be irreparable harm to the remainderman.
The fifth cause of action, against the partnership, also realleging paragraph 15, claims that the actions of the partnership have “increased the likelihood of a foreclosure against the Remainder Estates,” and alleges waste of assets resulting from the 1999 financing.
The sixth cause of action, alleging that the 1999 refinancing violated the “Remainderman’s rights under the Three Party Agreement and as surety,” seeks to have Lynx Properties defend plaintiffs title and “indemnify and hold harmless Remainderman” from all expenses, etc., in this action. This claim is grounded upon an alleged breach of a 1984 impleader agreement with Lynx Properties relating to marketable title.
The seventh cause of action is a claim of tortious interference against Bank One for allegedly interfering with plaintiffs “rights under the Three Party Agreements and as a surety.”
The eighth cause of action seeks an injunction against the partnership and the Malease defendants requiring them to pay real estate taxes and maintain liability insurance as required by a bankruptcy stipulation and the three-party agreements. It is alleged that the failure to have done so contravened the
*288 “Remainderman’s rights under the Stipulation and Order and Three Party Agreements, but also the Remainderman’s rights as surety.”
The ninth cause of action, repeating and realleging paragraph 15, claims that plaintiff has been damaged in an undetermined amount by the failure of the partnership and the Malease defendants to pay the taxes and insurance.

. Although there is a dispute as to the applicable law, my resolution of this issue turns on fundamental principles of suretyship and guaranty law and the law of real property. As to these principles there is really no dispute; the dispute concerns their application to the peculiar facts of this case.

. The claim of prejudice from the 1999 refinancing is grounded largely upon the new make-whole premium and to plaintiff this substantially increased the prepayment premium, which “as a practical matter prevent[ed] any future financing.” The Bank One defendants, while not conceding the point, have offered to stipulate to “waive any rights any of them may have to receive payment of a Make Whole Premium from any portion of Foreclosure Proceeds that would otherwise be payable to [plaintiff].” This offer was rejected.

. The Lynx defendants also argue that they had no obligation to notify plaintiff before the 1999 refinancing occurred, contending that the plaintiff was a holder of a remote junior interest. Since I am satisfied that the plaintiff was a secondary obligor, this argument is not considered.