Reversed by published opinion. Judge SHEDD wrote the opinion. Judge WILSON wrote an opinion concurring in the judgment. Judge DUNCAN wrote a dissenting opinion.
OPINION
SHEDD, Circuit Judge.
In this bankruptcy appeal, we must decide whether a creditor may allocate a *299 payment made by a non-debtor guarantor first to interest then to principal, thus preserving the unpaid principal for collection in bankruptcy. Because we find that the allocation of a payment in this manner would permit the creditor to collect an amount otherwise disallowed as post-petition interest, we reverse the judgment of the district court which permitted collection of the additional amount.
I
National Energy & Gas Transmission Energy Trading Power, L.P. (“ET Power”), a debtor here, previously operated as an energy marketing and trading company. As such, it bought and sold electric power, natural gas, coal, and other physical energy commodities. ET Power also engaged in energy-based financial and hedging transactions such as future contracts, swaps, options, and derivatives. As part of its regular course of business, ET Power entered into an electricity tolling agreement (the “Agreement”) with Liberty Electric Power, LLC (“Liberty”), an energy-generating company. Under the Agreement, ET Power obtained an option to purchase energy from Liberty in return for a monthly payment to Liberty as well as certain other variable costs based on the actual amount of energy which ET Power purchased. In essence, this permitted ET Power to provide natural gas necessary to generate electricity and then to purchase the electricity which was generated.
To back up its agreement with ET Power, Liberty obtained two guarantees: one from National Energy & Gas Transmission, Inc. (“NEGT”), ET Power’s corporate parent (and also a debtor in this bankruptcy); and one from Gas Transmission Northwest Corporation (“GTN”), a subsidiary of NEGT (and a non-debtor). Each guarantee contained the same terms, and in each the respective guarantor guaranteed:
[A]s primary obligor and not merely as surety, the prompt payment when due, in accordance with the terms of the Agreement, of all amounts payable by [ET Power] under the Agreement ... including ... Termination Payment ... and damage awards arising by reason of [ET Power’s] breach of its performance obligations under the Agreement or otherwise.
J.A. 98. Each guarantor’s Lability was capped at $140 million.
On July 8, 2003, NEGT, ET Power, and other debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and a motion seeking to reject the Agreement.[1] After ET Power and Liberty consented, the bankruptcy court granted the motion rejecting the Agreement. As a result of the rejection, Liberty sought $140 million as a termination payment and approximately $5.4 million in unpaid invoices. Liberty’s claim for $140 million proceeded to arbitration pursuant to the terms of the Agreement, and an arbitration panel awarded Liberty the full $140 million plus interest accruing from the date of the Agreement’s rejection and continuing subsequent to the arbitration award.[2]
*300 During the pendency of the arbitration proceedings, NEGT agreed to sell GTN to TransCanada Corporation. As part of the transaction, $140 million was reserved in escrow to provide for any liability to Liberty under the guarantee. After the arbitration award, the dispute between Liberty and the debtors shifted back to the bankruptcy court, while interest continued to accrue on the $140 million arbitration award. To stop the accrual of interest, which had reached approximately $17 million, the parties agreed that Liberty should receive immediate payment of the amount held in escrow after the GTN sale, and the bankruptcy court approved this disbursal. Accordingly, Liberty was paid $140 million from the GTN sale escrow in full and final satisfaction of the GTN guarantee.
Upon receipt of payment from GTN, Liberty allocated the $140 million first to interest, then to principal. Meanwhile, Liberty continued to assert claims in bankruptcy against NEGT and ET Power for $140 million each.[3] Liberty reasoned that it could continue to assert the full value of the award against the debtors, notwithstanding the fact that it had already received payment of $140 million from GTN, because the debtors remained jointly and severally liable until it received full payment of the total debt. At the same time, Liberty recognized that it could not collect more than the approximately $17 million needed to make it whole on ET Power’s debt. In seeking this amount, Liberty contended that the amount did not represent disallowed post-petition interest but rather unpaid principal — the interest portion of the award having been paid by GTN.
The debtors objected to Liberty’s claims, arguing that the $17 million which Liberty sought to collect had to constitute post-petition interest because Liberty had already received $140 million from GTN. Additionally, the debtors maintained that Liberty should not be permitted to assert a claim for $140 million when it had received $140 million and currently was owed only an additional $17 million. Otherwise, the judgment would not accurately reflect what Liberty was owed.
The bankruptcy court agreed with Liberty’s position, allowing the claim for $140 million against ET Power but providing that the “maximum amount of distribution payable to Liberty” would be limited to the additional $17 million which it seeks to collect. J.A. 322. On appeal to the district court, the bankruptcy court order was affirmed. The debtors once again appeal. Because this appeal presents only questions of law, our review is de novo. In re Bunker, 312 F.3d 145, 150 (4th Cir.2002).
II
A.
We initially consider the debtors’ contention that the value of Liberty’s claim *301 must be reduced by the $140 million it received from GTN in order to reflect accurately the amount currently owed to Liberty. Because Liberty is currently owed only approximately $17 million, the debtors argue its claim should be limited to this amount.
The debtors’ argument is foreclosed by the combination of Ivanhoe Building & Loan Ass’n of Newark v. Orr, 295 U.S. 243, 55 S.Ct. 685, 79 L.Ed. 1419 (1935), and New York law, which governs pursuant to the Agreement. In Ivanhoe, the Supreme Court held that a creditor need not deduct from his claim in bankruptcy an amount received from a non-debtor third party in partial satisfaction of an obligation. Thus, as a matter of bankruptcy law, ET Power’s debt to Liberty is not reduced by the amount which Liberty received from GTN. However, this merely leads to the question of what the value of ET Power’s debt is, and New York law provides the answer to this question. See Travelers Cas. & Sur. Co. of America v. Pacific Gas & Elec. Co., — U.S. -, 127 S.Ct. 1199, 1205, 167 L.Ed.2d 178 (2007) (“[W]e have long recognized that the basic federal rule in bankruptcy is that state law governs the substance of claims [.]”) (internal punctuation omitted).
New York law provides:
The amount or value of any consideration received by the obligee from one or more of several obligors, or from one or more of joint, or of joint and several obligors, in whole or in partial satisfaction of their obligations, shall be credited to the extent of the amount received on the obligations of all co-obligors to whom the obligor or obligors giving the consideration did not stand in the relation of a surety.
N.Y. Gen. Oblig. L. § 15-103. Under this statute, whether GTN’s payment to Liberty must be deducted from ET Power’s obligation turns on whether GTN was a surety or a co-obligor.
In Chemical Bank v. Meltzer, 93 N.Y.2d 296, 690 N.Y.S.2d 489, 712 N.E.2d 656 (1999), the New York Court of Appeals concluded that the relationship between the guarantor and the primary obligor must determine the guarantor’s status as a co-obligor or a surety, notwithstanding language in the contract purporting to render the guarantor a co-obligor. Using this approach, the court found that a surety-ship existed. The relationship between ET Power and GTN is nearly identical to that of the guarantor and primary obligor in Meltzer. Therefore, we conclude that, despite language in the guarantee purporting to make GTN a co-obligor, GTN was a surety for ET Power’s obligations to Liberty. Accordingly, the value of ET Power’s debt to Liberty under state law is not reduced by the $140 million received from GTN.
B.
We next turn to the more fundamental question presented by this appeal: whether the Bankruptcy Code bars Liberty from collecting the $17 million it now seeks. Section 502(b)(2) of the Code provides that a claim shall not be allowed “to the extent that ... [it] is for unmatured interest^]” 11 U.S.C. § 502(b)(2). The purpose of this section is two-fold: (1) the avoidance of unfairness among competing creditors, and (2) the avoidance of administrative inconvenience. Bruning v. United States, 376 U.S. 358, 362, 84 S.Ct. 906, 11 L.Ed.2d 772 (1964). As with all sections of the Code, § 502(b)(2) exists to guide the court in the administration of a bankruptcy estate so “as to bring about a ratable distribution of assets among the bankrupt’s creditors.” Vanston Bondholders Protective Committee v. Green, 329 U.S. *302 156, 161, 67 S.Ct. 237, 91 L.Ed. 162 (1946); see also In re A.H. Robins Co., Inc., 972 F.2d 77, 82 (4th Cir.1992) (noting that bankruptcy court possesses “broad equity powers”). Indeed, § 502(b)(2) itself reflects the equitable nature of the Code, and our application of its bar on post-petition interest is to be guided by principles of equity. Vanston Bondholders, 329 U.S. at 165, 67 S.Ct. 237 (“It is manifest that the touchstone of each decision on allowance of interest in bankruptcy ... has been a balance of equities between creditor and creditor or between creditors and the debtor.”). Thus, in applying § 502(b)(2), we have a duty to “sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate.” Smith v. Robinson, 343 F.2d 793, 801 (4th Cir.1965).[4]
In this case, Liberty seeks to collect $17 million from ET Power notwithstanding the fact that it has already received the full value — $140 million — of the debt which it was owed by ET Power on the petition date. In so doing, Liberty classifies the additional $17 million which it seeks as unpaid principal. It reaches this result by applying GTN’s payment of $140 million first to interest then to principal. Therefore, Liberty maintains that it is coming into bankruptcy to assert a claim for, and to collect only the remaining portion of, the $140 million which it was owed as of the petition date.
We believe that § 502(b)(2) prevents Liberty from collecting the additional $17 million it seeks despite Liberty’s classification of that amount as principal. On the date the debtors filed their bankruptcy petition, the Agreement was effectively rejected and Liberty sustained damages, although the value of the damages was then unknown and disputed. Subsequently, through arbitration, Liberty’s damages were determined to be $140 million. Thus, Liberty’s damages and ET Power’s debt to Liberty on the petition date was $140 million, and by the terms of § 502(b)(2), Liberty could not collect in bankruptcy any additional amounts added due to the accrual of interest. Nicholas v. United States, 384 U.S. 678, 682, 86 S.Ct. 1674, 16 L.Ed.2d 853 (1966) (“[T]he accumulation of interest on claims against a bankrupt estate is suspended as of the date the petition in bankruptcy is filed.”). This result is not altered simply because Liberty holds a guarantee from a non-debtor third party. Accordingly, the arbitration panel’s award of interest on the $140 million in damages, while perhaps appropriate under the Agreement and as a matter of non-bankruptcy law, is not collectable from the debtors in bankruptcy by virtue of § 502(b)(2).
The § 502(b)(2) bar to collection of interest is not overcome by Liberty’s classification of the $17 million it now seeks as principal. Regardless of how Liberty classifies GTN’s payment for its own purposes, we must “sift the circumstances surrounding” the claim to determine the reality of the transaction for purposes of the bankruptcy proceeding. Smith, 343 F.2d at 801. Because ET Power’s debt was capped at $140 million by the filing of the bankruptcy petition and because the debt was increased only by the accrual of interest pursuant to the arbitration award, we view Liberty’s claim for an additional $17 million as disallowed post-petition interest no matter how Liberty chooses to classify *303 it.[5]
A contrary result would permit Liberty, or any other creditor, to classify a payment on a debt from a non-debtor guarantor as non-principal, thus preserving the full value of the principal for collection in bankruptcy. If, for example, Liberty had classified GTN’s payment of $140 million not as a payment on the debt but as consideration received in return for a covenant not to sue, we would certainly look behind the transaction and would not allow collection as principal of the full $140 million. We must likewise look behind Liberty’s claim here to find that the claim really constitutes post-petition interest disguised as unpaid principal.
Our construction of Liberty’s claim is reinforced by the policy interests represented by § 502(b)(2). As we noted earlier, the general purpose of § 502 is “to ensure the fair allocation of assets between creditors[.]” In re Kielisch, 258 F.3d 315, 325 (4th Cir.2001). Thus, in cases where the allowance of post-petition interest will not result in administrative inconvenience or unfairness to creditors, post-petition interest may be allowed. See, e.g., United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 246, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (noting pre-Bankruptcy Code rule permitting the award of post-petition interest where estate is solvent); Ford Motor Credit Co. v. Dobbins, 35 F.3d 860, 869 (4th Cir.1994) (referring to rule permitting an over-secured creditor to collect interest to the extent of his over-security). In contrast, allowing Liberty to collect the additional amount it seeks will have an impact on ET Power’s creditors: namely, the loss of $17 million from the estate which would otherwise be available for distribution. This being so, the purpose of § 502(b)(2) is best served by barring Liberty’s collection of an additional $17 million from the estate.
Ill
For these reasons, we conclude that § 502(b)(2) prevents Liberty from collecting the additional $17 million which it seeks from the estate. Accordingly, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion. In so doing, we do not reverse the allowance of Liberty’s claim for unpaid invoices, which is not before us in this appeal.

REVERSED

. As the remaining debtors are not parties to this appeal, we refer herein to NEGT and ET Power as "the debtors.” However, we note that the bankruptcy court denied Liberty’s claim against NEGT, and Liberty does not appeal this denial.

. The debtors stipulated to the amounts owed pursuant to the unpaid invoices, and these claims were not submitted to the arbitration panel. Both the bankruptcy court and the district court allowed a claim for these debts in the amount of $5,428,046, and the debtors do not contest this claim on appeal. Thus, in *300 reversing the district court’s order, we do not reverse the allowance of this claim.

. Liberty set forth ET Power’s approximate liabilities as: $140 million in principal, $5.4 million in unpaid invoices, $16.8 million in interest on the principal and invoice amounts, and $3.7 million in collection costs and fees. Liberty recognized that it could not collect the $16.8 million in interest from the debtors, and the invoice amount and collection costs and fees are not at issue in this appeal. For simplicity, we focus on the $140 million at issue here. Likewise, we recognize that Liberty actually seeks to collect approximately $22 million from the estate but that approximately $5 million of this amount (the unpaid invoices) is not at issue. Thus, again for simplicity, we refer herein to the additional $17 million which Liberty seeks and which is now at issue.

. The Bankruptcy Code, of course, provides parameters within which courts must exercise their equitable powers in administering an estate. Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988).

. Liberty claims that we must accept its classification of GTN's payment as interest rather than as principal because bankruptcy proceedings cannot affect the liability of a non-debtor on a debt. See, e.g., In re Stoller’s, Inc., 93 B.R. 628, 635-36 (Bankr.N.D.Ind.1988) (finding that guarantors remained liable for post-petition interest as allowed by terms of guarantee). Thus, Liberty argues that preventing it from collecting the additional $17 million it seeks will essentially relieve GTN of its obligation to pay interest. We disagree. Liberty is free to classify GTN's payment as interest or to pursue collection from GTN at any time. Any limitation of Liberty's right to recover from GTN the full amount it is owed is due to the terms of GTN's guarantee or to non-bankruptcy law, not to our decision here. We merely hold that Liberty may not affect the rights of a party in bankruptcy by its classification of a payment received from a non-debtor guarantor.