■ SUMITOMO MITSUI BANKING CORPORATION, Appellant-Respondent, v CREDIT SUISSE et al., Respondents-Appellants. [933 NYS2d 234]—

In 2006, Credit Suisse and other lenders, including plaintiff, entered into a $5.5 billion unsecured credit agreement (the 2006 credit agreement) with nonparty Capmark Financial Group, Inc. (Capmark). Credit Suisse and other lenders also entered a $5.25 billion unsecured bridge loan agreement (the bridge loan) with Capmark. Plaintiff was not a bridge loan lender, but purchased a $200 million participation interest therein from Credit Suisse.

The participation agreement provides that upon receipt by Credit Suisse of any "cash Distribution," Credit Suisse shall pay plaintiff its pro rata share, and that upon receipt of a "non-cash Distribution," Credit Suisse shall transfer to plaintiff, at plaintiff's expense, its share of "the beneficial and record ownership of such . . . non-cash Distribution." The participation agreement defines "Distribution" as "any payment or other distribution (whether received by set-off or otherwise) of cash (including interest), notes, securities or other property (includ-

ing collateral) or proceeds under or in respect of the Seller's Interest."

In 2009, facing an increasingly challenging financial situation, Capmark commenced negotiations to restructure its debt, including the $833 million principal balance of the bridge loan, which was due March 23, 2009. Towards this end, in May 2009, Capmark and the 2006 credit agreement lenders, the bridge loan lenders and several new lenders executed a secured $1.5 billion term facility credit and guaranty agreement (the 2009 credit agreement), the proceeds of which were be used "solely to make an Existing Bridge Loan Agreement Repayment and an Existing [2006] Credit Agreement Repayment." Existing bridge loan agreement repayment was defined as "any ratable repayment or prepayment in cash of outstanding Existing Bridge Loans." Existing credit agreement repayment was defined as "any ratable repayment or prepayment of outstanding 'loans' under and as defined in the [2006 credit agreement] in cash (accompanied, in the case of any repaid Revolving Credit Loans, with a permanent reduction in the corresponding Revolving Credit Commitments)." Capmark and the lenders also executed "Amendment No. 3 and Waiver to the [2006] Credit Agreement" and "Amendment No. 9 and Waiver to the Bridge Loan Agreement" which provided that Capmark would make repayments "in cash."

As a condition precedent to the closing, the 2009 credit agreement provided that "substantially contemporaneously" with the borrowing under the 2009 credit agreement, not less than $984,375,000 of an existing credit agreement repayment and $590,625,000 of an existing bridge loan repayment "shall occur." The $984,375,000 was comprised of $937,500,000 in loan proceeds and $46,875,000 of Capmark's own funds. The $590,625,000 was comprised of $562,500,000 in loan proceeds and $28,125,000 of Capmark's own funds. The payments did not extinguish the bridge loan; rather, the loan's maturity date was extended to March 23, 2011 and the 2009 credit agreement provided that the outstanding balance was "to be updated after finalization of funds flow."

When Credit Suisse received its share of the $28,125,000 payment that Capmark made towards the bridge loan from its own funds, it gave plaintiff its pro rata share in cash. However, characterizing the $562,500,000 in loan proceeds applied to the bridge loan from the 2009 credit agreement as a reallocation of debt, Credit Suisse took the position that it was a noncash distribution under the participation agreement and offered to transfer to plaintiff its share of Capmark's new secured debt.

Plaintiff rejected the offer, taking the position that the $562,500,000 was a cash distribution under the participation agreement, entitling plaintiff to $21,640,859.14 in cash. Plaintiff maintains that because the participation agreement defines "Distribution" to include amounts received "by set-off or otherwise," physical movement of the 2009 loan proceeds back and forth between plaintiff and Credit Suisse was not required, the salient point being that Capmark used the loan proceeds to pay down the bridge loan and Credit Suisse did not have the right to convert plaintiff's participation in the bridge loan into participation in the 2009 credit agreement.

To mitigate damages, the parties sold $21,640,859.14 of Capmark's secured debt to a third party, of which plaintiff received $14,356,171.32. In this action, plaintiff seeks to recover the $7,284,687.82 balance, plus interest, based on defendants' alleged breach of the participation agreement. Defendants counterclaim for a declaratory judgment that plaintiff is not entitled to its pro rata share in cash because defendants received secured debt, not cash, from Capmark.

The proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case (*see Alvarez v Prospect Hosp.*, 68 NY2d 320 [1986]). Plaintiff satisfied this burden by submitting the 2009 credit agreement and amendment to the bridge loan agreement, which stated that Capmark would make repayments in cash, and Capmark's quarterly financial statement for June 30, 2009 to September 2009, which reflected that the balance of the bridge loan had been reduced from $833,000,000 as of December 31, 2008 to $234,204,000 as of June 30, 2009.* This shifted the burden to defendants to present evidentiary facts in admissible form sufficient to raise a genuine, triable issue of fact (*see Zuckerman v City of New York*, 49 NY2d 557, 562 [1980]).

In opposition to plaintiff's motion, defendants submitted an affidavit from Didier Siffer, who had overseen Credit Suisse's relationship with Capmark since February 2009. Siffer stated that the 2009 transaction restructured the bridge loan and 2006

---

* We note that in *In re Capmark Fin. Group Inc.* (438 BR 471, 491-492 [D Del 2010]), the United States Bankruptcy Court for the District of Delaware, stated, "62. *Use of Proceeds.* The proceeds from the Secured Credit Facility, together with $75 million from CFGI, were used to pay antecedent debt of CFGI and the subsidiary Guarantors, as follows: (i) approximately $984.4 million was used to pay a portion of the amounts owed under the Credit Facility, *see* Debtors' Ex. 4 (d); and (ii) the balance, approximately $590.6 million, was used to pay a portion of the amounts owed under the Bridge Loan. *See* Debtors' Ex. 2 (j); Hr'g Tr. 132:13-24 (Fairfield)."

credit agreement, extending the maturity of the loans in exchange for receiving a security interest and small cash payment from Capmark. Siffer further stated that defendants "did not receive a cash payment for the $562,500,000 principal portion of the Bridge Loan that was restructured." In support, Siffer annexed a May 28, 2009 letter from Capmark to Citibank, the administrative agent for the bridge loan, concerning the "Repayment of USD Bridge Loan Agreement Dated As Of March 23, 2006 (As Amended Supplemented Or Otherwise Modified, The 'Loan Agreement')," which states,

"The undersigned hereby requests the following Loan continuation:

| | | |
|---|---|---|
| "1. | Repayment will occur on: | May 29, 2009 (a business day) |
| "2. | Repayment amount: | USD $28,125,000.00 |
| "3. | Reallocation amount: | USD $562,500,000.00 |
| "4. | Under the: | USD Bridge Loan Agreement |
| "5. | Loans denominated in USD: | Eurocurrency Loans |
| "6. | Borrower: | Capmark Financial Group Inc." |

Siffer's affidavit and the Capmark letter raise an issue of fact as to whether there was a cash payment to satisfy the bridge loan or a reallocation of debt. Although the documents in connection with the 2009 transaction brand the $562,500,000 as a cash repayment, it is the economic substance of a transaction that should determine the rights and obligations of interested parties (see 801 S. Fulton Ave. Corp. v Radin, 138 AD2d 561 [1988]; see also International Trade Admin. v Rensselaer Polytechnic Inst., 936 F2d 744, 748 [2d Cir 1991] [courts look to "the economic substance of the transaction and not its form" (internal quotation marks and citation omitted)]).

Although the Capmark letter is hearsay (see Gryphon Dom. VI, LLC v APP Intl. Fin. Co., B.V., 18 AD3d 286 [2005]), it may be considered in opposition to plaintiff's motion because it is not the only proof submitted (see Guzman v L.M.P. Realty Corp., 262 AD2d 99, 100 [1999]; Koren v Weihs, 201 AD2d 268 [1994]). However, the letter cannot support defendants' cross motion for summary judgment.

Federal cases holding that a taxpayer is not entitled to a deduction for paying interest in cash if he borrows funds from a lender to pay interest to the same lender (see e.g. Davison v Commissioner of Internal Revenue, 141 F3d 403 [2d Cir 1998]) are not dispositive. In any event, the lenders who lent Capmark money in 2009 were identical to the bridge loan lenders. Although defendants contend that the lenders on the 2009 credit facility were the same as, or the successors to, the bridge loan

lenders and the lenders on the 2006 credit facility, plaintiff disputes this.

Defendants are not entitled to summary judgment based on section 3.1 of the participation agreement, as it is far from clear whether the 2009 credit agreement is a "Credit Document" under the participation agreement. Plaintiff's interpretation that "in connection therewith" means "in connection with the Bridge Loan agreement" is reasonable, but defendants' interpretation that the phrase includes "in connection with waivers and amendments to the bridge loan agreement" is also reasonable. Moreover, the meaning cannot be determined solely from the participation agreement. Therefore, the court properly denied both sides' motions for summary judgment (*see e.g. Kohman v Rochambeau Realty & Dev. Corp.*, 17 AD3d 151, 152 [2005]).

Defendants' argument that, even if the 2009 credit agreement is not a credit document, they are still entitled to summary judgment because the 2009 credit facility restructured the bridge loan, is unavailing. If the 2009 credit agreement is not a credit document, the exclusion clause in the definition of "Obligations" ("excluding . . . any obligations and liabilities of Seller which . . . are attributable to Seller's actions or obligations in any capacity other than as a Lender under the Credit Documents") would apply. Concur—Andrias, J.P., Sweeny, Renwick and Manzanet-Daniels, JJ.

Catterson, J., dissents in a memorandum as follows: In my view, the undisputed facts in the record demonstrate that Capmark did nothing more in the transaction at issue than restructure the bridge loan to extend the maturity date. This restructuring, rather than repayment, granted various lenders a secured position in exchange for the bulk of the unsecured bridge loan. Therefore, I am compelled to dissent and would grant summary judgment to Credit Suisse.

The record sets out what the majority and the court below overlooked in denying summary judgment, the context of the transaction documents. Plaintiff and the majority rely on the expressions "cash" and "repayment" in the 2009 bridge loan agreement and amendment No. 9 to find an issue of fact. However, as set out below, it is plain that there was no payment in cash to Credit Suisse and the purpose of the transaction was simply an exchange of debt.

Initially, I note that all of the restructuring documents relied on by plaintiff and referenced by the majority only describe obligations of the parties going forward. None of the documents reflect actual events that occurred in the performance of the re-

structuring. Credit Suisse's obligation to make a cash distribution to Sumitomo would only be triggered by the threshold events. Capmark must necessarily have made a cash payment of $562,500,000 to Citibank, and Citibank actually made a corresponding cash payment to Credit Suisse. The record contains no evidence whatsoever that any cash payment migrated from Capmark to Citibank and then on to Credit Suisse.

I agree with the majority that we must consider "the substance of the entire transaction, rather than its form." (*Chemical Bank v Meltzer*, 93 NY2d 296, 302 [1999].) In *Chemical Bank*, the Court further cautioned that we must not "focus on a few words of a single instrument[; the] transaction must be analyzed as an integrated whole." (93 NY2d at 304.) We must not "elevate form over substance, obfuscate the nature of [the parties'] legal obligations and gloss over the essential character of th[e] transaction." (*Id.*) In this case, the "essential character" of the transaction was to substitute secured debt for unsecured debt. This is made clear by repeated references in the 2009 agreement to refinancing the bridge loan. Furthermore, the notices from Capmark to Citibank and from Citibank to Credit Suisse document the "reallocation" and/or "roll up" of the bridge loan in secured debt. The notices do not refer to a repayment to Credit Suisse of the bridge loan debt.

The participation agreement is clear at sections 1.1 and 5 that Credit Suisse is only obligated to deliver to Sumitomo its share of any distribution "[u]pon receipt" by Credit Suisse. Thus, Sumitomo was only entitled to its ratable share of any cash actually received by Credit Suisse.

In my view, Sumitomo has presented no evidence whatsoever that refutes the notifications from Capmark to Citibank and from Citibank to Credit Suisse that show that the bridge loan debt was not repaid but rather "reallocat[ed]" or "roll[ed] up" into secured debt. Mere allegations that Credit Suisse received a cash distribution via setoff are insufficient to defeat Credit Suisse's motion for summary judgment.