O. Bruton SMITH, Appellant,

v.

Robert N. ROBINSON, Trustee in Reorganization of Charlotte Motor Speedway, Inc., Appellee.

In the Matter of CHARLOTTE MOTOR SPEEDWAY, INC., Debtor.

No. 9500.

United States Court of Appeals Fourth Circuit.

Argued Oct. 9, 1964.

Decided March 4, 1965.

Francis O. Clarkson, Jr., Charlotte, N. C. (Craighill, Rendleman & Clarkson, Charlotte, N. C., on brief), for appellant.

Jack T. Hamilton, Charlotte, N. C. (Robert G. Sanders, Fairley, Hamrick, Hamilton & Monteith, and Sanders & Walker, Charlotte, N. C., on brief), for appellee.

Before SOBELOFF, Chief Judge, and BOREMAN and J. SPENCER BELL, Circuit Judges.

BOREMAN, Circuit Judge:

This appeal is from an order of the District Court in a reorganization proceeding under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq. On November 3, 1961, Charlotte Motor Speedway, Incorporated (hereinafter Speedway), filed a petition for corporate reorganization under Chapter X which was approved by the court on the same day and a Trustee in Reorganization was appointed. Smith, appellant, an officer and director of the corporation, filed five claims against the Trustee alleging that Speedway was, for various reasons, indebted to him. The Trustee objected to Smith's claims and filed eight counterclaims asserting that Smith was indebted to Speedway. The claims and counterclaims were consolidated for hearing, the court heard the evidence and entered an order allowing some of the Smith claims, denying others, allowing some of the counterclaims and denying others.

The underlying facts leading to the filing of the petition for reorganization are briefly stated. Speedway was conceived, organized and promoted in 1959 by the appellant, Smith, and one Curtis Turner for the purpose of constructing and operating near Charlotte, North

Carolina, one of the largest automobile speedways in the United States. Prior to this time Smith and Turner had been in the automobile racing business. Both owned interests in several small race tracks and Turner was a promoter and race driver. From the inception of Speedway in 1959 until June of 1961, Turner served as its president and a member of the board of directors. For approximately the same period Smith served as executive vce-president, general manager and a member of the board of directors. From June of 1961 until the petition for reorganization was filed in November, Smith served in the capacity of promotion director, Smith and Turner were substantial shareholders in Speedway. At the time of the hearing Smith stated he owned approximately 34,000 shares and Turner stated he owned 29,450 shares.

Soon after the corporation was organized it acquired a 550-acre tract of land on which to build the raceway. A contract was negotiated with W. Owen Flowe & Sons Construction Company to do the necessary grading and the work began in the early fall of 1959. Completion came in the spring of 1960 and the first race was held in June of that year. During this period of construction Smith was actively engaged in managing Speedway and devoted his time and energy toward the completion of the track. In this same period most of the acts which led to the present controversy took place.

It appears that Speedway had financial problems from the beginning. The financial situation became more acute when the grading contractor encountered rock formations which had to be removed at extra cost. When the speedway was finally completed and opened for racing events, obligations had been incurred which could not be met. A change in management a year later apparently did not help and, after approximately another six months, the petition for reorganization was filed.

█ At the beginning we recognize the limitations upon the scope of review to be exercised by this court. The case was heard by the District Court and we are bound by the findings of fact unless they are clearly erroneous. F.R.Civ.P. 52(a); Austin v. National Discount Corp., 322 F.2d 928 (4 Cir. 1963). With this principle in mind, we turn to a consideration of the specific issues raised on this appeal.

### CLAIM #60

A few days before March 8, 1960, Turner as president and Smith as vice-president of Speedway issued in Smith's name stock certificate #1799 for 12,500 shares of Speedway stock which had a fair market value of $25,000. At the same time certificate #1800 for 12,500 shares was issued in Turner's name. There was no consideration at that time for the issuance of either certificate. Smith and Turner pledged the two certificates with the Toledo Trust Company (herein called Toledo) as collateral security for a personal loan to them of $50,000. The loan proceeds were divided equally and Smith deposited $25,000 in his personal account in the Bank of Charlotte. By his personal check #148 dated March 8, 1960, Smith transferred $25,000 to Speedway. On the same day a demand note, bearing interest at six per cent in the face amount of $25,000, was executed in Speedway's name payable to Smith. The note was signed by Turner as president and Smith as secretary of Speedway. A similar procedure was followed for Turner. This $25,000 note issued to Smith was the basis for his claim #60 against the Trustee.

The effect of the transaction up to and including the execution and delivery of the note may be summarized as follows: Speedway had received $25,000 in cash from Smith but parted with 12,500 shares of its capital stock having a value of $25,000 and had executed and delivered to Smith its note for $25,000; Smith had ostensibly acquired 12,500 shares of Speedway stock which he used as collateral to protect himself in borrowing $25,000 from Toledo and had obtained Speedway's note for $25,000; for the stock and note Smith had paid to Speedway the sum of $25,000.

Approximately a year later on March 1, 1961, Turner was advised and he then informed Toledo that certificates #1799 and #1800 had been improperly issued and would have to be recalled and cancelled, but other certificates would be sent to replace them. On March 3, 1961, Toledo received by registered mail certificate #3407 in Smith's name for 12,500 shares to replace certificate #1799. (It also received certificate #3408 to replace #1800 but that part of the transaction involving Turner's rights is not presented in this controversy.) Toledo returned certificate #1799 to Turner by mail but what happened to it thereafter remains uncertain. There was evidence that the upper left-hand corner of a stock certificate with the number 1799 on it was stapled to the stub in the stock certificate book. The remainder of the certificate was not accounted for but there was testimony that detaching a corner of a stock certificate was not the proper cancellation procedure. On the stub of the certificate there was a written inscription which a witness identified as being in Smith's handwriting as follows: "Samp. for Attorneys for SEC—OBS." This supposedly indicated that the certificate had been sent to the Securities and Exchange Commission. Smith contended, however, that this was not his writing and that certificate #1799 was returned and cancelled.

In February of 1961 when stock certificate #3407 was issued in his name, Smith surrendered to the corporation a $12,500 note which had been executed by Speedway to him. The consideration he had given for this note does not appear but the Trustee conceded that it was lawfully issued and did not contest the note's validity. When the exchange took place, Smith contended the fair market value of the stock was less than $1.00 a share. The Trustee asserted that the value was $2.00 a share and that a corporate resolution prohibited any sale by the corporation for less than $1.80 per share, net to Speedway. Smith admitted he knew of the resolution but stated that exceptions had been made in the past.

In an attempt to show his good faith, Smith introduced evidence that in the fall of 1961 he had agreed to return certificate #3407 and take back the $12,500 note but that the officers of Speedway at the time thought it would be best for Speedway's financial situation if Smith retained the shares.

Smith's position during the proceedings was that the $25,000 note was a valid corporate obligation because stock certificate #1799 had been returned to Speedway and cancelled; consequently, the note evidenced Speedway's indebtedness to him for his $25,000 check. Further, certificate #3407 for 12,500 shares of Speedway stock was issued to him when the fair market value of the stock was less than $1.00 per share in exchange for a $12,500 note plus accrued interest which validated this exchange.

The District Court found that certificate #1799 was made out to Smith and that Smith falsely wrote on the stub that the certificate had been sent to the Securities and Exchange Commission as a sample; that Smith took this certificate to Toledo, represented that he was the legal owner, pledged it as collateral and obtained a personal loan of $25,000; that Smith deposited this in his personal bank account and gave his own check to Speedway for that amount; that these funds were actually received by Speedway; that Smith at that time caused the $25,000 note to be executed to him; that on or about February 28, 1961, certificate #1799 held by Toledo was replaced by certificate #3407 representing the same number of shares; that what appeared to be the upper left-hand corner of the certificate was stapled to the stub of the certificate in the stock book; that the remainder of certificate #1799 was not accounted for; that when certificate #3407 for 12,500 shares was issued to Smith in exchange for the Speedway $12,500 note in March 1961, the fair market value of the stock was approximately $2.00 per share and a corporate resolution was then in effect that no Speedway stock could be sold for less than $1.80 per share, net; and that Toledo present-

ly held certificate #3407 as collateral for the loan to Smith.

From these findings the court reached the conclusion that Toledo was an innocent transferee of certificate #3407 and that a fair and equitable appraisal of the entire transaction, in view of Smith's fiduciary relationship and obligation to Speedway, required the holding, in effect, that (1) Smith purchased 12,500 shares of the Speedway stock upon the payment of $25,000 in March 1960; Smith became the owner of certificate #3407 upon surrender of #1799; (2) the note for $25,000 issued to Smith in March 1960 should be voided without payment; and (3) the exchange of the $12,500 note for certificate #3407 should be rescinded and Smith could then recover that sum from Speedway.

Smith generally attacks the court's findings and conclusions and then asserts two specific findings as being contrary to the evidence. He contends that the court erred, first, in finding that Smith falsely wrote on the stub of the certificate an inscription indicating that #1799 had been sent to the Securities and Exchange Commission and, second, in finding that the fair market value of the stock was $2.00 when the $12,500 note was exchanged for certificate #3407. The first point has no real substance; even if incorrect, this finding would not control the ultimate outcome.

■■■ From the evidence set forth, particularly in view of the fact that Smith as claimant had the burden of proof and as an officer of Speedway must show the transaction to have been fair and reasonable, we are of the opinion that the court's conclusions were justified and that the court's disposition of Claim 60 should not be disturbed. The main issue, and the one Smith particularly attacks here, was the court's finding that the fair market value of the stock when certificate #3407 was issued in exchange for the $12,500 note and the surrender of #1799 was approximately $2.00 a share. Testimony on this point was in conflict and it was the District Court's responsibility to determine the facts. In addition, Smith admitted he knew of the corporate resolution which prohibited the sale of stock for less than $1.80 per share, net to Speedway. It is a settled rule that a corporate officer acts in a fiduciary capacity and cannot profit at the expense of the corporation. While it is true that the North Carolina law and the general law do not prohibit corporate officers from dealing with the corporation, the adversely interested party must prove that the transaction was fair, just and reasonable when entered into. See N. Car.Gen.Stat., § 55–30(b) (3).

CLAIM #62

This claim comprised several items for which Smith sought reimbursement. Total recovery was allowed by the court on every item except number two which was a claim for the rental of a motor grader. Of the $5,274.75 requested, the court allowed $1,000. It is not disputed and the court found that Speedway used Smith's motor grader during the period from March 1 through October 13, 1961. The contest concerns the number of hours the grader was used and the rental value per hour.

In filing his claim Smith sought to recover rent for 811½ hours at a rate of $6.50 per hour. The evidence showed that the number of hours claimed was taken from the payroll records of Speedway and was based upon the total hours worked by several motor grader operators but it was clear that only one could have operated Smith's motor grader at a particular time. Further, there was evidence that the operators performed other duties and that the grader in question had not been in operating condition for a portion of the claimed period because the transmission had gone bad and had to be repaired. Also, it is not clearly established by the record whether the grader, when in operating condition, was used every working day or only periodically before, during and after races. As to the rental value, Smith stated that by an oral contract Speedway was to pay $6.00 per hour and furnish the driver, but this purported agreement was made when Smith was an officer of Speedway.

Mr. Ellington, who began working for Speedway in April of 1961 and who is presently the executive vice-president and general manager, testified that no oral agreement had been reached and that he had repeatedly attempted to make some arrangement with Smith but without success.

■■ From this conflicting and uncertain evidence the court concluded that it was impossible to determine how much time the various operators had operated the particular grader but that an award in some amount should be made as the equipment had been used and was necessary for the operation of the speedway. To prevent unjust enrichment to Speedway, the court allowed Smith the sum of $1,000. We cannot say this finding was clearly erroneous. It was Smith's responsibility to produce the evidence from which the court could make a determination. It was shown, and the court so found, that the equipment had been used but the evidence to prove even the approximate amount of time the grader had been used and the fair rental value was vague and uncertain. After reviewing the facts, including the fact that Speedway had recently purchased a similar motor grader at a cost of $2,500, the court determined that compensation in the amount of $1,000 was reasonable and just. We cannot say on the record before us that this was error.

### COUNTERCLAIM (f)

■ The Trustee filed this counterclaim to recover $1,350 advanced to Smith which allegedly was not spent for corporate purposes. The total sum which Smith admittedly received was represented by three Speedway checks made payable to him and signed by him and Turner. The first check was for $300, dated April 20, 1960; the second check was for the same amount, dated April 23, 1960; and the third check was for $750, dated May 25, 1960.

The only testimony on this issue came from Smith and Hurt, the latter being the accountant for Speedway from January of 1960 until late June of 1961.

Smith testified as follows: In January and February of 1960 some sixty floodlights at the Shelby Fairgrounds, Shelby, North Carolina, were dismantled, transported to Charlotte and erected at the speedway site to enable the contractors to work twenty-four hours a day pouring concrete for the stands. To erect the lights additional electric wiring had to be purchased. At the time Speedway did not have sufficient funds to pay the labor and transportation costs or to purchase the necessary electric wiring, so he paid the expenses and the checks were written to reimburse him. He stated that vouchers had been submitted but admitted that the board of directors had not approved the expenditures. Hurt's testimony, at least in part, supported Smith. Hurt testified that he could not remember the exact purpose for which the checks were written but could recall that they had something to do with floodlights. He specifically remembered seeing a voucher for one of the $300 checks but did not recall the others. However, he stated that a general audit of Speedway's records had been made for the period from its beginning to December of 1960 which revealed many checks without supporting vouchers, and at that time he had investigated and had satisfied himself that all were for proper corporate expenses.

The District Court found that the burden of proof was on the Trustee or Speedway as this was a counterclaim to recover money paid to Smith, that the board of directors had not approved the expenditures, and that no supporting vouchers could be found although Smith was not required to supply vouchers substantiating the expenditures in order to defeat the Trustee's claim. The court indicated doubt as to whether the money was spent for Speedway purposes and concluded that the Trustee had failed to sustain the burden of showing the payments were not for corporate purposes except to the extent of $750 which amount the Trustee was entitled to recover.

From the evidence, we cannot agree with the court that the Trustee should be

allowed to recover on this counterclaim. Other than the lack of supporting vouchers and the fact that the board of directors did not approve the expenditures, there is really no evidence in this record to support the finding that $750 was not spent for corporate purposes. It was shown that many expenditures were made for which vouchers could not be located and which were not specifically authorized by the board of directors. The only direct evidence supports a finding contrary to that of the District Court. It is affirmatively shown that this work was done and the materials were furnished for the benefit of Speedway; there was no showing that these costs were unreasonably high. We think the court erred in its disposition of this counterclaim.

### COUNTERCLAIM (h)

From September 11, 1959, until April 28, 1960, W. Owen Flowe & Sons Construction Company (sometimes called Flowe) paid to Turner and Smith a total of $25,000. Smith admitted he received $12,500 of this amount but asserted that these payments were for the rental of a motor grader and two water trucks which he and Turner jointly owned and which Flowe used in the construction work. The Trustee contended that these payments were kickbacks from Flowe, collected by Smith in breach of his fiduciary relationship to Speedway. This counterclaim was filed by the Trustee to recover the $12,500 plus interest.

The lower court found that these payments were kickbacks exacted from the contractor and that certain entries on the contractor's records which showed the payments were for equipment rental were a flimsy transparency to conceal the fraud. Smith contends that the court's findings were not supported by substantial evidence.

Undoubtedly there is evidence in the record which, if credited, would support a finding contrary to that of the lower court. Smith and Turner testified the payments were for rent of equipment used by Flowe. Their testimony was bolstered by five witnesses who stated they saw the motor grader and water trucks being used during the construction period. Also, Flowe's records, including the tax return and check vouchers, reflect that the money was paid as equipment rental. The minutes taken at a Speedway board of directors' meeting on August 26, 1960, show the directors were informed by Speedway's attorneys of the payments, and at a special meeting on August 29, 1960, attended by Smith, Turner, two other directors and the corporate attorneys, the two "disinterested directors," after Smith and Turner left the room, passed a resolution which stated that there was a bona fide rental agreement.

■ Smith urges that the approval of the rental contract by the two disinterested directors prevents Speedway from recovering under the provision of North Carolina General Statutes, § 55–30(b)(1). While no North Carolina cases were cited or found construing the statute as applied to transactions between a director and a third party, in our opinion the words "corporate transaction" were intended to apply to a situation where the corporate director is dealing directly with the corporation.

■ The fact that the evidence in this record might support a different finding and conclusion does not necessarily warrant reversal. This is not a trial de novo and the lower court's findings can only be set aside if they are clearly erroneous, having due regard to the opportunity of the court to judge the credibility of witnesses. The testimony of Mr. Flowe, president of the contracting company, was in direct conflict with the story told by Smith and Turner. Flowe testified that during the period the construction work was being performed, the contractor was to be paid periodically by Speedway and the payments were to be based upon percentages of the work completed at the time; that his company got into a financial bind and had to have the payments on time, but in order to obtain the payments which were due and owing from Speedway he had to agree to pay

Smith and Turner in return for delivery of Speedway's checks. Other evidence of a circumstantial nature also tends to support the lower court's findings. The total amount of money paid to Smith and Turner for rent in relation to the value of the equipment itself, which witnesses testified was approximately $12,000, would seem excessive. The manner in which Turner acquired his interest in the equipment created suspicious circumstances. Smith owned the equipment before Speedway was organized. When Speedway was formed and construction had been started, he sold Turner a one-half interest for Turner's personal note of $7,500 and $5,000 in cash. After construction was completed Turner resold his interest to Smith for Smith's cancellation of Turner's $7,500 note. Upon our review of the evidence on this point, being fully cognizant of the right of the court below to determine credibility issues, and in view of Smith's fiduciary relationship to Speedway, we cannot say that the court's finding that these payments were kickbacks was clearly erroneous.

## INTEREST

Counsel for Smith requested the court below to adopt a proposed conclusion of law which provided that Smith had a right to recover interest at six per cent on all his claims approved by the court from the date each claim accrued until paid. The court refused and Smith contends this was error.

The law is well settled that a creditor will not be allowed interest from the date of filing of a petition in bankruptcy until the claim is paid. Bruning v. United States, 376 U.S. 358, 361, 84 S.Ct. 906, 11 L.Ed.2d 772 (1964); City of New York v. Saper, 336 U.S. 328, 331, 69 S.Ct. 554, 93 L.Ed. 710 (1949); Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 163, 67 S.Ct. 237, 91 L.Ed. 162 (1946); Sexton v. Dreyfus, 219 U.S. 339, 31 S.Ct. 256, 55 L.Ed. 244 (1911); United States v. Harrington, 269 F.2d 719 (4 Cir. 1959); 3 Collier on Bankruptcy, § 63.16

(14 Ed. 1964). It was once thought that the rule in corporate reorganization proceedings was different, see 6 Collier on Bankruptcy, § 9.08 at page 2817, but recent authority supports the position that the rule disallowing post-petition interest in ordinary bankruptcy applies to corporate reorganizations. United States v. Edens, 189 F.2d 876 (4 Cir. 1951), affirmed per curiam 342 U.S. 912, 72 S. Ct. 357, 96 L.Ed. 682 (1952); In Re Magnus Harmonica Corp., 262 F.2d 515 (3 Cir. 1959); State of New York v. Feinberg, 204 F.2d 502 (2 Cir. 1953); 6 Collier on Bankruptcy, § 9.08 (1963 Supp.). Consequently, Smith did not have a right to recover interest on the approved claims after the date the petition was filed.

Although the general rule would normally permit Smith to recover interest on the approved claims up to the time the petition was filed, we think the court could, in the exercise of its sound discretion, deny it. In Chapter X proceedings the court sits as a court of equity and equitable considerations are applicable. 9 Am.Jur.2d, Bankruptcy, § 1495 (1963). As stated in Vanston Bondholders Protective Committee v. Green, supra, 329 U.S. at page 165, 67 S.Ct. at page 241:

"It is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor. * * *"

Applying equity principles, we conclude that the nature of the transactions and the surrounding circumstances which gave rise to Smith's claims and the Trustee's counterclaims would be sufficient to justify the disallowance of a claim for interest. As the Court stated in Pepper v. Litton (1939) 308 U.S. 295, at pages 307–308, 60 S.Ct. 238, at pages 245–246, 84 L.Ed. 281:

"As we have said, the bankruptcy court in passing on allowance of claims sits as a court of equity.

Hence these rules governing the fiduciary responsibilities of directors and stockholders come into play on allowance of their claims in bankruptcy. In the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate. And its duty so to do is especially clear when the claim seeking allowance accrues to the benefit of an officer, director, or stockholder. That is clearly the power and duty of the bankruptcy courts under the reorganization sections. * * *"

The case will be remanded for further proceedings consistent with the views herein expressed.

Affirmed in part, reversed in part and remanded.