PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

In Re: NATIONAL ENERGY & GAS
TRANSMISSION, INCORPORATED,
formerly known as PG&E National
Energy Group, Inc.,

*Debtor.*

---

NATIONAL ENERGY & GAS
TRANSMISSION, INC. (f/k/a PG&E
National Energy Group, Inc.);
NEGT ENERGY TRADING POWER, L.P.
(f/k/a PG&E Energy Trading Power,
L.P.),

*Plaintiffs-Appellants,*

and

GAS TRANSMISSION NORTHWEST
CORPORATION,

*Plaintiff,*

v.

LIBERTY ELECTRIC POWER, LLC,

*Defendant-Appellee,*

JOHN L. DAUGHERTY, Trustee,

*Trustee-Appellee.*

No. 06-1459

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(8:05-cv-02531-PJM; 03-30459; AP-03-03104)

Argued: March 13, 2007

Decided: July 10, 2007

Before SHEDD and DUNCAN, Circuit Judges, and
Samuel G. WILSON, United States District Judge for the
Western District of Virginia, sitting by designation.

---

Reversed by published opinion. Judge Shedd wrote the opinion. Judge Wilson wrote an opinion concurring in the judgment. Judge Duncan wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** Steven Wilamowsky, BINGHAM & MCCUTCHEN, L.L.P., New York, New York, for Appellants. Lawrence M. Handlesman, STROOCK, STROOCK & LAVAN, New York, New York, for Appellee. **ON BRIEF:** Jessica S. Etra, Matthew V. Wargin, WILLKIE, FARR & GALLAGHER, L.L.P., New York, New York; Kenneth Oestreicher, Susan J. Roberts, WHITEFORD, TAYLOR & PRESTON, L.L.P., Baltimore, Maryland, for Appellants. Lisa Bittle Tancredi, VENABLE, L.L.P., Baltimore, Maryland; Melvin A. Brosterman, Harold A. Olsen, STROOCK, STROOCK & LAVAN, New York, New York, for Appellee.

---

## OPINION

SHEDD, Circuit Judge:

In this bankruptcy appeal, we must decide whether a creditor may allocate a payment made by a non-debtor guarantor first to interest then to principal, thus preserving the unpaid principal for collection in bankruptcy. Because we find that the allocation of a payment in this manner would permit the creditor to collect an amount otherwise disallowed as post-petition interest, we reverse the judgment of the district court which permitted collection of the additional amount.

I

National Energy & Gas Transmission Energy Trading Power, L.P. ("ET Power"), a debtor here, previously operated as an energy mar-

keting and trading company. As such, it bought and sold electric power, natural gas, coal, and other physical energy commodities. ET Power also engaged in energy-based financial and hedging transactions such as future contracts, swaps, options, and derivatives. As part of its regular course of business, ET Power entered into an electricity tolling agreement (the "Agreement") with Liberty Electric Power, LLC ("Liberty"), an energy-generating company. Under the Agreement, ET Power obtained an option to purchase energy from Liberty in return for a monthly payment to Liberty as well as certain other variable costs based on the actual amount of energy which ET Power purchased. In essence, this permitted ET Power to provide natural gas necessary to generate electricity and then to purchase the electricity which was generated.

To back up its agreement with ET Power, Liberty obtained two guarantees: one from National Energy & Gas Transmission, Inc. ("NEGT"), ET Power's corporate parent (and also a debtor in this bankruptcy); and one from Gas Transmission Northwest Corporation ("GTN"), a subsidiary of NEGT (and a non-debtor). Each guarantee contained the same terms, and in each the respective guarantor guaranteed:

> [A]s primary obligor and not merely as surety, the prompt payment when due, in accordance with the terms of the Agreement, of all amounts payable by [ET Power] under the Agreement . . . including . . . Termination Payment . . . and damage awards arising by reason of [ET Power's] breach of its performance obligations under the Agreement or otherwise.

J.A. 98. Each guarantor's liability was capped at $140 million.

On July 8, 2003, NEGT, ET Power, and other debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and a motion seeking to reject the Agreement.[1] After ET Power and Lib-

---

[1]As the remaining debtors are not parties to this appeal, we refer herein to NEGT and ET Power as "the debtors." However, we note that the bankruptcy court denied Liberty's claim against NEGT, and Liberty does not appeal this denial.

erty consented, the bankruptcy court granted the motion rejecting the Agreement. As a result of the rejection, Liberty sought $140 million as a termination payment and approximately $5.4 million in unpaid invoices. Liberty's claim for $140 million proceeded to arbitration pursuant to the terms of the Agreement, and an arbitration panel awarded Liberty the full $140 million plus interest accruing from the date of the Agreement's rejection and continuing subsequent to the arbitration award.[2]

During the pendency of the arbitration proceedings, NEGT agreed to sell GTN to TransCanada Corporation. As part of the transaction, $140 million was reserved in escrow to provide for any liability to Liberty under the guarantee. After the arbitration award, the dispute between Liberty and the debtors shifted back to the bankruptcy court, while interest continued to accrue on the $140 million arbitration award. To stop the accrual of interest, which had reached approximately $17 million, the parties agreed that Liberty should receive immediate payment of the amount held in escrow after the GTN sale, and the bankruptcy court approved this disbursal. Accordingly, Liberty was paid $140 million from the GTN sale escrow in full and final satisfaction of the GTN guarantee.

Upon receipt of payment from GTN, Liberty allocated the $140 million first to interest, then to principal. Meanwhile, Liberty continued to assert claims in bankruptcy against NEGT and ET Power for $140 million each.[3] Liberty reasoned that it could continue to assert

---

[2]The debtors stipulated to the amounts owed pursuant to the unpaid invoices, and these claims were not submitted to the arbitration panel. Both the bankruptcy court and the district court allowed a claim for these debts in the amount of $5,428,046, and the debtors do not contest this claim on appeal. Thus, in reversing the district court's order, we do not reverse the allowance of this claim.

[3]Liberty set forth ET Power's approximate liabilities as: $140 million in principal, $5.4 million in unpaid invoices, $16.8 million in interest on the principal and invoice amounts, and $3.7 million in collection costs and fees. Liberty recognized that it could not collect the $16.8 million in interest from the debtors, and the invoice amount and collection costs and fees are not at issue in this appeal. For simplicity, we focus on the $140 million at issue here. Likewise, we recognize that Liberty actually seeks to collect approximately $22 million from the estate but that approximately $5 million of this amount (the unpaid invoices) is not at issue. Thus, again for simplicity, we refer herein to the additional $17 million which Liberty seeks and which is now at issue.

the full value of the award against the debtors, notwithstanding the fact that it had already received payment of $140 million from GTN, because the debtors remained jointly and severally liable until it received full payment of the total debt. At the same time, Liberty recognized that it could not collect more than the approximately $17 million needed to make it whole on ET Power's debt. In seeking this amount, Liberty contended that the amount did not represent disallowed post-petition interest but rather unpaid principal — the interest portion of the award having been paid by GTN.

The debtors objected to Liberty's claims, arguing that the $17 million which Liberty sought to collect had to constitute post-petition interest because Liberty had already received $140 million from GTN. Additionally, the debtors maintained that Liberty should not be permitted to assert a claim for $140 million when it had received $140 million and currently was owed only an additional $17 million. Otherwise, the judgment would not accurately reflect what Liberty was owed.

The bankruptcy court agreed with Liberty's position, allowing the claim for $140 million against ET Power but providing that the "maximum amount of distribution payable to Liberty" would be limited to the additional $17 million which it seeks to collect. J.A. 322. On appeal to the district court, the bankruptcy court order was affirmed. The debtors once again appeal. Because this appeal presents only questions of law, our review is de novo. *In re Bunker*, 312 F.3d 145, 150 (4th Cir. 2002).

II

A.

We initially consider the debtors' contention that the value of Liberty's claim must be reduced by the $140 million it received from GTN in order to reflect accurately the amount currently owed to Liberty. Because Liberty is currently owed only approximately $17 million, the debtors argue its claim should be limited to this amount.

The debtors' argument is foreclosed by the combination of *Ivanhoe Building & Loan Ass'n of Newark v. Orr*, 295 U.S. 243 (1935), and

New York law, which governs pursuant to the Agreement. In *Ivanhoe*, the Supreme Court held that a creditor need not deduct from his claim in bankruptcy an amount received from a non-debtor third party in partial satisfaction of an obligation. Thus, as a matter of bankruptcy law, ET Power's debt to Liberty is not reduced by the amount which Liberty received from GTN. However, this merely leads to the question of what the value of ET Power's debt is, and New York law provides the answer to this question. *See Travelers Cas. & Sur. Co. of America v. Pacific Gas & Elec. Co.*, 127 S.Ct. 1199, 1205 (2007) ("[W]e have long recognized that the basic federal rule in bankruptcy is that state law governs the substance of claims[.]") (internal punctuation omitted).

New York law provides:

> The amount or value of any consideration received by the obligee from one or more of several obligors, or from one or more of joint, or of joint and several obligors, in whole or in partial satisfaction of their obligations, shall be credited to the extent of the amount received on the obligations of all co-obligors to whom the obligor or obligors giving the consideration did not stand in the relation of a surety.

N.Y. Gen. Oblig. L. § 15-103. Under this statute, whether GTN's payment to Liberty must be deducted from ET Power's obligation turns on whether GTN was a surety or a co-obligor.

In *Chemical Bank v. Meltzer*, 712 N.E.2d 656 (N.Y. 1999), the New York Court of Appeals concluded that the relationship between the guarantor and the primary obligor must determine the guarantor's status as a co-obligor or a surety, notwithstanding language in the contract purporting to render the guarantor a co-obligor. Using this approach, the court found that a suretyship existed. The relationship between ET Power and GTN is nearly identical to that of the guarantor and primary obligor in *Meltzer*. Therefore, we conclude that, despite language in the guarantee purporting to make GTN a co-obligor, GTN was a surety for ET Power's obligations to Liberty. Accordingly, the value of ET Power's debt to Liberty under state law is not reduced by the $140 million received from GTN.

B.

We next turn to the more fundamental question presented by this appeal: whether the Bankruptcy Code bars Liberty from collecting the $17 million it now seeks. Section 502(b)(2) of the Code provides that a claim shall not be allowed "to the extent that. . . [it] is for unmatured interest[.]" 11 U.S.C. § 502(b)(2). The purpose of this section is two-fold: (1) the avoidance of unfairness among competing creditors, and (2) the avoidance of administrative inconvenience. *Bruning v. United States*, 376 U.S. 358, 362 (1964). As with all sections of the Code, § 502(b)(2) exists to guide the court in the administration of a bankruptcy estate so "as to bring about a ratable distribution of assets among the bankrupt's creditors." *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 161 (1946); *see also In re A.H. Robins Co., Inc.*, 972 F.2d 77, 82 (4th Cir. 1992) (noting that bankruptcy court possesses "broad equity powers"). Indeed, § 502(b)(2) itself reflects the equitable nature of the Code, and our application of its bar on post-petition interest is to be guided by principles of equity. *Vanston Bondholders*, 329 U.S. at 165 ("It is manifest that the touchstone of each decision on allowance of interest in bankruptcy . . . has been a balance of equities between creditor and creditor or between creditors and the debtor."). Thus, in applying § 502(b)(2), we have a duty to "sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate." *Smith v. Robinson*, 343 F.2d 793, 801 (4th Cir. 1965).[4]

In this case, Liberty seeks to collect $17 million from ET Power notwithstanding the fact that it has already received the full value — $140 million — of the debt which it was owed by ET Power on the petition date. In so doing, Liberty classifies the additional $17 million which it seeks as unpaid principal. It reaches this result by applying GTN's payment of $140 million first to interest then to principal. Therefore, Liberty maintains that it is coming into bankruptcy to assert a claim for, and to collect only the remaining portion of, the $140 million which it was owed as of the petition date.

---

[4]The Bankruptcy Code, of course, provides parameters within which courts must exercise their equitable powers in administering an estate. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988).

We believe that § 502(b)(2) prevents Liberty from collecting the additional $17 million it seeks despite Liberty's classification of that amount as principal. On the date the debtors filed their bankruptcy petition, the Agreement was effectively rejected and Liberty sustained damages, although the value of the damages was then unknown and disputed. Subsequently, through arbitration, Liberty's damages were determined to be $140 million. Thus, Liberty's damages and ET Power's debt to Liberty on the petition date was $140 million, and by the terms of § 502(b)(2), Liberty could not collect in bankruptcy any additional amounts added due to the accrual of interest. *Nicholas v. United States*, 384 U.S. 678, 682 (1966) ("[T]he accumulation of interest on claims against a bankrupt estate is suspended as of the date the petition in bankruptcy is filed."). This result is not altered simply because Liberty holds a guarantee from a non-debtor third party. Accordingly, the arbitration panel's award of interest on the $140 million in damages, while perhaps appropriate under the Agreement and as a matter of non-bankruptcy law, is not collectable from the debtors in bankruptcy by virtue of § 502(b)(2).

The § 502(b)(2) bar to collection of interest is not overcome by Liberty's classification of the $17 million it now seeks as principal. Regardless of how Liberty classifies GTN's payment for its own purposes, we must "sift the circumstances surrounding" the claim to determine the reality of the transaction for purposes of the bankruptcy proceeding. *Smith*, 343 F.2d at 801. Because ET Power's debt was capped at $140 million by the filing of the bankruptcy petition and because the debt was increased only by the accrual of interest pursuant to the arbitration award, we view Liberty's claim for an additional $17 million as disallowed post-petition interest no matter how Liberty chooses to classify it.[5]

---

[5]Liberty claims that we must accept its classification of GTN's payment as interest rather than as principal because bankruptcy proceedings cannot affect the liability of a non-debtor on a debt. *See, e.g., In re Stoller's, Inc.*, 93 B.R. 628, 635-36 (Bankr. N.D. Ind. 1988) (finding that guarantors remained liable for post-petition interest as allowed by terms of guarantee). Thus, Liberty argues that preventing it from collecting the additional $17 million it seeks will essentially relieve GTN of its obligation to pay interest. We disagree. Liberty is free to classify GTN's payment as interest or to pursue collection from GTN at any time. Any

A contrary result would permit Liberty, or any other creditor, to classify a payment on a debt from a non-debtor guarantor as non-principal, thus preserving the full value of the principal for collection in bankruptcy. If, for example, Liberty had classified GTN's payment of $140 million not as a payment on the debt but as consideration received in return for a covenant not to sue, we would certainly look behind the transaction and would not allow collection as principal of the full $140 million. We must likewise look behind Liberty's claim here to find that the claim really constitutes post-petition interest disguised as unpaid principal.

Our construction of Liberty's claim is reinforced by the policy interests represented by § 502(b)(2). As we noted earlier, the general purpose of § 502 is "to ensure the fair allocation of assets between creditors[.]" *In re Kielisch*, 258 F.3d 315, 325 (4th Cir. 2001). Thus, in cases where the allowance of post-petition interest will not result in administrative inconvenience or unfairness to creditors, post-petition interest may be allowed. *See, e.g., United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 246 (1989) (noting pre-Bankruptcy Code rule permitting the award of post-petition interest where estate is solvent); *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860, 869 (4th Cir. 1994) (referring to rule permitting an over-secured creditor to collect interest to the extent of his over-security). In contrast, allowing Liberty to collect the additional amount it seeks *will* have an impact on ET Power's creditors: namely, the loss of $17 million from the estate which would otherwise be available for distribution. This being so, the purpose of § 502(b)(2) is best served by barring Liberty's collection of an additional $17 million from the estate.

III

For these reasons, we conclude that § 502(b)(2) prevents Liberty from collecting the additional $17 million which it seeks from the

limitation of Liberty's right to recover from GTN the full amount it is owed is due to the terms of GTN's guarantee or to non-bankruptcy law, not to our decision here. We merely hold that Liberty may not affect the rights of a party in bankruptcy by its classification of a payment received from a non-debtor guarantor.

estate. Accordingly, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion. In so doing, we do not reverse the allowance of Liberty's claim for unpaid invoices, which is not before us in this appeal.

*REVERSED*

WILSON, District Judge, concurring in the judgment:

As I view it, the overarching issue in this appeal is reduced to this: does Liberty's contractual right with GTN, a third party, to allocate principal and interest, that is, to call payments from that guarantor what it wants to call them, preclude the Bankruptcy Court from calling those payments what they are vis-à-vis the bankrupt debtor. That is, can Liberty allocate its way around § 502(b)(2)'s disallowance of unmatured interest. In my view to do so is to simply call a rose by another name.* Accordingly, I concur in the judgment.

DUNCAN, Circuit Judge, dissenting:

As the bankruptcy court succinctly stated in an order summarily affirmed by the district court, the debtors here proffer no authority "for the proposition that a *non-debtor* guarantor is exempt from liability to pay interest accruing after the petition date of the debtor-primary obligor" under 11 U.S.C. § 502(b)(2). *Nat'l Energy & Gas Transmission, Inc. v. Liberty Elec. Power, LLC* (*In re Nat'l Energy & Gas Transmission, Inc.*), No. 03-03104, at *6 (Bankr. D. Md. June 27, 2005) (emphasis added). Because the majority advances no support for its conclusion that bankruptcy law governs the contractual

---

*Two preliminary observations simplify the playing field for me. First, I do not believe that Judge Shedd's opinion challenges Liberty's contractual rights under its guarantee from GTN to allocate principal and interest in any fashion it sees fit in relation to GTN. Second, we are not compelled to explore Liberty's right to recover from NEGT under NEGT's guarantee because the Bankruptcy Court disallowed Liberty's claim against NEGT and Liberty did not appeal. Indeed, at the risk of oversimplification, NEGT seems to be little more than a cheerleader for ET Power or a surrogate for GTN in this appeal. The real dispute, therefore, is only between the primary obligor and its creditor.

relationship between a creditor and a non-debtor guarantor—and ample authority exists to the contrary—I respectfully dissent.

As the majority explains, an arbitration panel awarded Liberty $140 million plus approximately $17 million in interest accrued after the debtors' bankruptcy petition had been filed. Liberty collected $140 million from GTN, which was the maximum amount for which GTN could be liable under the terms of its guarantee. Liberty characterized GTN's payment as first, a payment of the $17 million interest, and next, a payment of part of the $140 million principal.

Liberty continued to assert its claim in bankruptcy against the debtors for the full $140 million, recognizing, however, that it could not collect more than the approximately $17 million needed to satisfy the debt. In Liberty's view, this $17 million represented principal for which the debtors remained jointly and severally liable, even though they had filed for bankruptcy.[1]

Proper analysis of Liberty's claim begins with the basic principle of contract law that Liberty is entitled to be paid in full, including interest, by its jointly and severally liable debtors. When one or more debtors file a bankruptcy petition, as here, it is undisputable that § 502(b)(2) bars a creditor from recovering interest not yet accrued as of the date of the bankruptcy petition against such a debtor. *See* Majority Op. at 7-8. However, it is also well-settled that § 502(b)(2) has no impact on the accrual of unmatured interest against non-debtors, including non-debtor guarantors. *See, e.g.*, *Bruning v. United States*, 376 U.S. 358, 362 n.4 (1964) (explaining that claims do not "los[e] their interest-bearing quality" in bankruptcy, but that post-petition interest is disallowed as a "rule of distribution"); *Kielisch v. Educ. Credit Mgmt Corp. (In re Kielisch)*, 258 F.3d 315, 323 (4th Cir. 2001) ("Section 502 bars creditors from making *claims* from the bankruptcy estate for unmatured interest," but "does not purport to limit the *liability* on those claims, i.e., 'debts.'"); *In re El Paso Refining, Inc.*, 192 B.R. 144, 146 (Bankr. W.D. Tex. 1996) (holding that § 502(b)(2) only bars "unmatured interest from becoming an allowed claim against the debtor's [bankruptcy] estate" and that "the obliga-

---

[1]As the majority notes, only Liberty's claim against ET Power is at issue in this appeal.

tion to pay interest vis-a-vis a guarantor is not tolled or eliminated by operation of section 502(b)(2)" (emphasis omitted)).

The majority intermingles these independent principles to arrive at its holding: that the $17 million that Liberty seeks to recover from ET Power represents "disallowed post-petition interest no matter how Liberty chooses to classify it." Majority Op. at 8. This approach, however, has the effect of limiting the non-debtor guarantor's liability for interest accruing after the debtor's bankruptcy petition. That is, the majority would have the bar to recovery of interest from the debtor swallow the accrual of interest on the debt across all parties liable for it. There is simply nothing in the Bankruptcy Code, applicable case law, the relevant guarantee agreement, or nonbankruptcy law to support the jettisoning of basic contract law principles in favor of an expansive reading of § 502(b)(2).[2]

In fact, the majority's approach actually seems to run counter to another section of the Bankruptcy Code. Section 524(e) provides that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." *See also El Paso*, 192 B.R. at 146 (holding that § 524(e) mandated that the independent obligations of a guarantor were unaffected by the

---

[2]The majority attempts to justify its result by invoking this court's duty to "'sift the circumstances surrounding' the claim to determine the reality of the transaction for purposes of the bankruptcy proceeding." Majority Op. at 8 (citing *Smith v. Robinson*, 343 F.2d 793, 801 (4th Cir. 1965). There is no reason, however, to allow "sift[ing] the circumstances" to engulf even basic principles of contract law by restructuring the private contracts of non-debtors.

The majority also seeks to place the blame for Liberty's inability to collect the full amount of its debt on the guarantee itself, which caps GTN's liability at $140 million. *See id.* at 8 n.5. If GTN's liability under the guarantee were unlimited, the majority apparently reasons, Liberty could collect the full value of its claim from GTN. As a matter of contract law, the majority is correct. But, as the bankruptcy court noted, "the cap [on GTN's liability in its contract with Liberty is] no impediment to Liberty's right to be paid in full from all sources" where the debtors are jointly and severally liable for the principal debt. *Nat'l Energy & Gas Transmission, Inc.*, No. 03-03104, at *8.

bankruptcy of the principal obligor); *Stoller's, Inc. v. Peoples Trust Bank (In re Stoller's, Inc.)*, 93 B.R. 628, 635-36 (Bankr. N.D. Ind. 1998) (holding guarantors liable for post-petition interest). The majority's holding appears to expressly violate § 524(e) by allowing the bankruptcy filing of the debtors to dictate how Liberty accounts for its contractual payment from GTN, or, in other words, allowing the "discharge of a debt of the debtor [to] affect the liability of [GTN] on . . . such debt," § 524(e).

Furthermore, in contrast to the majority's contention, I do not believe that a creditor's receipt of payment from a non-debtor guarantor implicates either of the purposes of § 502(b)(2): (1) avoiding "unfairness as between competing creditors" and (2) minimizing the "administrative inconvenience" that repeated recomputation of interest requires, *Bruning*, 376 U.S. at 362. With respect to the first, I fail to see the unfairness in the fact that Liberty bargained, outside of bankruptcy, for a guarantee of payment. That other creditors may not have secured such a guarantee, and therefore might ultimately recover proportionally less than Liberty, strikes me as no injustice. Second, even the debtors do not argue that the bankruptcy court's order below would require burdensome recomputation of interest, as it specifies the allowed amount of Liberty's claim as determined in the arbitration proceeding.

Therefore, because neither bankruptcy law nor the contract governing Liberty's relationship with the non-debtor guarantor GTN limits Liberty's right to allocate its recovery from GTN in any manner that it wishes, I would affirm the district court.